**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBA**

| | | |
|---|---|---|
| **CARNEYSHA MENDOZA**<br>**2651 Pinewood Drive**<br>**Waldorf, Maryland 20601**<br><br>**Plaintiff/Complainant**<br>**v.**<br><br>**UNITED STATES CAPITOL POLICE**<br>**119 D Street NE**<br>**Washington D.C. 20510**<br><br>**Defendant/Respondent** | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, Inspector Carneysha Mendoza, by and through her undersigned attorney, hereby files suit against the United States Capitol Police for discriminatory non-promotion because of her race, sex, and/or a combination of race and sex, in violation of the Congressional Accountability Act. For her complaint, Plaintiff states as follows, on information and belief, in the aggregate or in the alternative:

Essentially, USCP is engaged in an effort to reverse Diversity, Equity and Inclusion gains and eliminate diversity in leadership within the Department. Inspector Mendoza, a black female, is a high-profile casualty in that campaign, and she has been passed over for promotion to a Deputy Chief and an Assistant Chief position, because of anti-black and anti-female bias.

Inspector Mendoza is a 24 year-veteran of the United States Capitol Police, who has deep experience in nearly every facet of USCP's operations, and who has been the commanding officer of some of the most crucial specialty units within the Department. Inspector Mendoza has held

supervisory roles in four out of the six bureaus of the USCP, including in both operational and administrative positions.

In August 2025, USCP advertised for a Deputy Chief position, which was ultimately for the Operational Services Bureau. The Operational Services Bureau houses many of the specialty units, including the USCP's SWAT team (known as CERT), the bomb Squad, the hazardous materials response team, the K-9 Unit, and Special Operations Division, which Mendoza had commanded. Chief Sullivan announced the selection for Deputy Chief, as well as three appointments for Assistant Chief positions, all on April 13, 2026.

For the Deputy Chief position, Sullivan selected Matt Tighe, a white male who was not as qualified as Inspector Mendoza. Among other things, Tighe had never held any supervisory role in the Operational Services Bureau (which houses most specialty units) or in the Command and Coordination Bureau (which maintains the Command Division). Instead, his entire supervisor tenure within USCP has been within the Uniformed Services Bureau, managing the personnel who guard the congressional buildings and conduct screening of visitors.

Sullivan used a non-competitive selection process to fill the three Assistant Chief vacancies. Jessica Baboulis, who was an Inspector (like Plaintiff), was appointed to Assistant Chief, despite having a damning disciplinary record at USCP, including maintaining an improper romantic relation with a subordinate, which (among other things) resulted in her transfer to another division. Another Assistant Chief appointment went to John Erickson, who had a terrible discipline record, including lengthy suspensions for serious offenses including drunk driving and overtime fraud.

Chief Sullivan used opaque, non-competitive appointments in order to avoid selecting three highly qualified and decorated black female candidates: Inspector Mendoza, and two black, female

Deputy Chiefs, one of whom was the Deputy Chief over the Uniformed Services Bureau, and the second of whom had been the Acting Assistant Chief over the USCP's Protective Services and Intelligence Bureau for over a year, at the time of the selection.

As a result of Chief Sullivan's selection decisions, currently there are no black officials in the Office of the Chief at all.

## JURISDICTION

1. Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995, as amended (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

2. This is an action authorized and instituted pursuant to the Congressional Accountability Act, as amended (2 U.S.C. § 1301 *et seq*.).

3. The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

4. Plaintiff is an employee of the USCP and is therefore an "Covered Employee" covered by the Congressional Accountability Act, as amended (2 U.S.C. § 1301(3)(D)).

5. Defendant USCP is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

6. Defendant is headquartered in the District of Columbia.

7. The Congressional Accountability Act makes it unlawful for USCP to discriminate against employees based on, *inter alia*, their race and sex.

8. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. The Plaintiff filed a timely complaint at the Office of Congressional Workplace Rights, which included all claims made in this civil action, within the 180 day period which commenced

on April 13, 2026.

9. Plaintiff files this suit within the time limits defined by the Congressional Accountability Act. Plaintiff filed her Administrative Complaint at the Office of Congressional Workplace Rights on September 14, 2026, which was within 180 days of April 13, 2026 (the day the promotions were announced). Additionally, this Complaint is filed within 70 days of the date that Plaintiff filed her OCWR complaint, as required by the Congressional Accountability Act, and Plaintiff has not requested a hearing before the Office of Congressional Workplace Rights.

## FACTS SUPPORTING PLAINTIFF'S CLAIM OF RACE AND SEX DISCRIMINATION

### A. Inspector Mendoza's Career and Background

10. Inspector Mendoza is an African American woman and a 24 year-veteran of the United States Capitol Police.

11. Inspector Mendoza has been the commanding officer of some of the most crucial units within the Department. Inspector Mendoza currently oversees the Command Division where she is responsible for overseeing Department operations along with the nation's restricted airspace around Washington, DC, (among other things). She previously served (for approximately two years) as the Special Agent in Charge (SAIC) of the Investigation Division, a unit with employees spread between Florida, California and the District, and which (among other things) investigates threats against Members of Congress.

12. Previously, as a Captain, Mendoza oversaw the Civil Disturbance Unit, between January 2020 and October 2023. During that time, she directly managed and led 308 sworn CDU personnel and assisted in managing 172 sworn Special Operations Division officers and supervisors, in addition to 36 civilian.

13. Highlights, among many other protests and episodes of civil disobedience, in her

capacity as a Captain in CDU, Mendoza helped to manage USCP's response to the January 6, 2021 insurrection, during which she was severely injured, as well as the peaceful Black Lives Matter demonstrations in 2019 and 2020.

14. In addition to commanding the CDU, as a Captain, Plaintiff was also the assistant commander of the USCP's K-9 unit, CERT (USCP's elite SWAT team), and commander of the Less Lethal Teams, which are located within CERT and CDU.

15. These Less-Lethal Teams were a huge priority for USCP, which Mendoza significantly expanded after January 6, 2021 to provide USCP with better, non-lethal crowd control measures.

16. Not only was Plaintiff the commanding officer over CDU and the Less-Lethal Teams, but she was also an instructor for both.

17. Inspector Mendoza was also a Lieutenant in the Command Center for six years, during which time she was a designated Watch Commander, training fellow watch commanders, overseeing Department operations, liaising with the Courts and overseeing airspace security within a 30-mile radius of the DC area, and a sergeant in both the House and Senate Divisions, and the Patrol Division.

18. Inspector Mendoza has held supervisory roles in multiple divisions in USCP, both operational and administrative, and she has significant experience commanding specialty units and acting as incident and area commander for unplanned crises.

19. Inspector Mendoza has received the highest awards given to USCP personnel. As a front-line commander on January 6, 2021, then Captain Mendoza was included in the collective Congressional Gold Medal in 2022. Among other things, Inspector Mendoza also received the Distinguished service Medal for her leadership and response to an Active Shooter incident at a school in 2022 where she led a Team of specially trained officers into multiple schools to secure

staff and students while the shooter was still at large.

20. Additionally, Mendoza has received multiple leadership awards, a lifesaving award, and a community service award.

21. Inspector Mendoza graduated from the FBI National Academy in 2021.

22. According to the official website, "The FBI National Academy (NA) is a premier leadership development program designed to provide senior law enforcement leaders with transformative developmental opportunities that build partnerships and promote excellence in policing worldwide. In collaboration with the University of Virginia, this 10-week residential program offers accredited, university-level instruction to law enforcement leaders from across the United States and around the world. Students engage in rigorous academic coursework, comprehensive wellness training, and extensive networking designed to strengthen leadership and build lasting professional connections."

**B. The Deputy Chief Position**

23. USCP advertised for a Deputy Chief position in August 2025, under REQ624.

24. Inspector Mendoza was eligible and qualified for the position, and she timely applied for the promotion, supplying all of the required application materials on the required application platform.

25. Inspector Mendoza interviewed for the position before a panel composed of three individuals, including Asst. Chief Gallagher and Stephanie Whitam, who was the Chief of Police for the Supreme Court of the United States at position in October 2025. Chief Witham is widely known to be a close friend to Gallagher. The third interviewer was Luis Laparra, a non-sworn supervisor, with no law enforcement experience, who assigned to the Office of Facilities and Logistics, which was directly supervised by Assistant Chief Gallagher.

26. Consequently, among the interview panelists were one friend of Gallagher's, one subordinate and no other official with any knowledge of the USCP Deputy Chief position, aside from Gallagher.

27. There was no Human Resources official or neutral observer for the interview, per typical USCP practice.

28. Jessica Baboulis (now Ruskoski) (white female) and Matt Tighe (white male) were also interviewed for the position, possibly among others.

29. On or about April 13, 2026, Chief of Police Michael Sullivan, announced the results of the Deputy Chief selection, as well as the non-competitive appointments of three new Assistant Chiefs.

30. Promotions became effective on April 19, 2026.

31. For the Deputy Chief selection, Chief Sullivan selected Matt Tighe, a white male who was not as qualified as Inspector Mendoza. When he was promoted, Tighe was assigned as the Deputy Chief overseeing the Operational Services Bureau, which houses many of the specialty units that Plaintiff has commanded.

32. Inspector Mendoza was more qualified than Tighe. Plaintiff had more experience as a commanding officer over, and instructor for, specialized USCP operations than Tighe, including CDU, CERT, K9 and the Less-Lethal teams. Mr. Tighe had no experience over any of those operations. Instead, his career as a supervisor has been limited to the Uniformed Services, which primarily stand guard and screen visitors.

33. Inspector Mendoza has a history of valorous achievement at USCP, whereas Tighe did not.

34. During the January 6 Insurrection, for example, Insp. Mendoza responded to the

Capitol from home to assist officers in trouble after working late the previous night. Inspector Mendoza was personally physically involved in the struggle to fend off the attacks of the January 6 insurrectionists. In that effort, Inspector Mendoza suffered chemical burns to her face, neck and head.

35. On the other hand, it is widely known among USCP officers and executives that Tighe remained in the Cannon Subway, even as other USCP officers begged for assistance.

36. Inspector Mendoza completed the 10-week FBI National Academy program in 2021, whereas Tighe has not participated or completed in that prestigious training program.

37. Inspector Mendoza has outperformed Tighe on all previous promotions – meaning that despite having similar time in the Department, Mendoza was promoted to Sergeant before Tighe; she was promoted to Lieutenant approximately 3 years before Tighe; and she was promoted to Captain approximately one year before Tighe. On information and belief, Plaintiff also outperformed Tighe during the Inspector selection and was ranked above him for that promotion list.

**C. The Assistant Chief Appointment**

38. For the Assistant Chief selection, Jessica Baboulis (Ruskoski), a white female, skipped right over the Deputy Chief rank and was appointed to Assistant Chief.

39. At the time that Baboulis (Ruskoski) was promoted to Assistant Chief, she was only an Inspector, so Inspectors were considered eligible for the promotion to Assistant Chief.

40. On information and belief, Baboulis was not required to submit additional application materials for the Assistant Chief position, nor did she conduct a separate interview for the Assistant Chief position.

41. Because Plaintiff was also an Inspector, and because she went through the same

application and interview process as Baboulis, Mendoza was also eligible for promotion to Assistant Chief position.

42. Plaintiff wanted to be considered for the Assistant Chief position, and she would have applied for it had there been an opportunity to do so.

43. Inspector Mendoza was better qualified than Babloulis/Ruskoski because she had more experience as a commanding officer over specialized USCP units and personnel and more complex and demanding assignments than Babloulis/Ruskoski.

44. Plaintiff also has more experience as an incident and area commander for unplanned crises (such as active shooter incidents), than Baboulis.

45. Inspector Mendoza completed the 10-week FBI National Academy program in 2021, whereas Baboulis has not participated or completed in that prestigious training program.

46. Additionally, Baboulis (Ruskoski) has a damning disciplinary record at USCP, including maintaining an improper romantic relation with a subordinate.

47. Plaintiff, on the contrary, has only one minor infraction over the course of her 24 years with USCP.

48. USCP leadership has a history of providing white executives, including Baboulis (Ruskoski), with preferential treatment that was not extended to Inspector Mendoza, as a Black woman.

49. In 2025, Baboulis was permitted to use official time to work on a graduate degree at the Post Naval Graduate School, in Monterrey California. Additionally, on information and belief, the USCP pays for Baboulis' travel to Monterrey when she is required to attend in-person classes and events. On the other hand, Inspector Mendoza – following USCP policy – is currently required to use personal time to work on her Master of Public Safety degree, through the University of

Virginia.

50. Normally any USCP-funded training or educational programs would be advertised to eligible candidates, and an objective selection would be made among candidates who applied, but the Post Naval Graduate School program was granted specifically to Baboulis without any such process.

51. Also, regarding the Assistant Chief selection, USCP's practice over the past twenty or more years is to hold competitive selections for the Assistant Chief positions.

52. Chief Sullivan used the non-competitive appointment process to avoid selecting three black female candidates: Inspector Mendoza, and two African American, female Deputy Chiefs, one of whom was Deputy Chief over the Uniformed Services Bureau, which was the largest Bureau (measured by number of officers) in the Department. The second Deputy Chief had been the Acting Assistant Chief over the USCP's Protective and Intelligence Operations for over a year, at the time the appointments were announced; and she had been named the 2025 Executive of the Year at USCP.

53. Baboulis was named Assistant Chief of Protective and Intelligence Operations.

54. The new Deputy Chief and all of the new Assistant Chiefs are white: Matt Tighe, Tom Loyd, Jessica Baboulis and John Erickson.

55. In addition to Baboulis, who had a poor disciplinary record (*supra*), Chief Sullivan appointed John Erickson who had a terrible discipline record, including drunk driving while on duty and overtime pay fraud.

**D. Other Evidence of Discrimination Against Women and African Americans**

56. In its 198-year history, the U.S. Capitol Police has never had a permanently appointed black Chief of Police

57. As evidence of his bias against minorities, including Black and female officers, in August 2025, Chief Sullivan disbanded the Office of Equity and Inclusion, which was charged with helping the department cultivate a diverse workforce, including among leadership.

58. Chief Sullivan sent an employee in the Office of Facilities and Logistics to collect and destroy all Office of Equity and Inclusion materials across USCP, including materials that Inspector Mendoza had in her office. When Inspector Mendoza asked Chief Sullivan about the incident, he stated that his instructions were that the materials would be removed from her office overnight, when no one would be present.

59. The USCP has a history of supporting and even promoting executives who make discriminatory personnel decisions, both under Chief Sullivan and previously.

60. For example, in 2025 a jury found that the USCP K9 training program had discriminated against Officer Mauricia VanMeter by removing her from the K9 training program because she was a female.

61. Evidence at trial showed that the training staff falsified Officer VanMeter's training records to make her performance appear worse than her male colleagues, and Lead Trainer Kenneth (Kenny) Hill admitted under oath that he modified certification testing to allow one white male officer make it through with a dog who was confused and unable to locate explosive targets, and that he falsified testing records in order to allow another white, male handler to pass the K9 certification exam, even though the handler had made numerous serious mistakes during the examination.

62. Despite the judgment that they discriminated against a candidate on the basis of sex, and being required to pay an enormous verdict to Officer VanMeter, under Chief Sullivan's watch, none of the training staff were disciplined or removed from their posts.

63. As another example, in 2023, in proceedings before the Office of Congressional Workplace Rights (OCWR), then Dep. Chief Jason Bell was found to have discriminated against Sgt. Juan Cobbin (black male), by removing Sgt. Cobbin from his position as the head of K9 training, transferring him to a non-K9 position at the Library of Congress, and replacing him with an unqualified white sergeant, all in order to appease a group of racist white K9 officers who were upset at having a black sergeant over the program. Despite the finding against Dep. Chief Bell, the USCP promoted him to Assistant Chief in October 2023, within a month of the final appellate decision against USCP.

64. As a result of Chief Sullivan's personnel decisions currently there are no Black officials in the Office of the Chief at all.

65. In the April 2026 official bulletin announcing the Deputy Chief selection and the all-white Assistant Chief Selections, Chief Sullivan stated "I have since day one nearly a year ago, spent my time reviewing our operations top to bottom while meeting many of you along the way. Now it is time to make key decision that position us for long-term success. These are the first steps in a broader effort to strengthen our leadership team and structure."

66. None of the leaders whose promotions were announced on April 13, 2026 were Black, meaning that Sullivan promoted no Black candidates to Assistant Chief, Deputy Chief, Inspector, or Captain.

67. The message that Chief Sullivan effectively communicated to all USCP officers and staff that in the Department was that the future of USCP and its leadership would not include Black leadership.

68. Newly appointed Assistant Chief Erickson understood that message well. For years, Erickson has had a mug on his desk on which is printed "I'm the fucker in charge of you fucks."

Prior to Sullivan becoming Chief, that mug largely (if not always) remained in Erickson's office. However, after Sullivan promoted him to Assistant Chief, Erickson has felt emboldened to use the mug during meetings with Black staff. For example, on August 28, 2026, Erickson held a meeting with four African American supervisors, including Deputy Chief Mitchell, Inspector Mendoza, a Captain and an Executive Officer to a Deputy Chief. Erickson brought the mug to the meeting, which sent a clear message about the Department's view of the low standing of Black employees and supervisors.

69. In further evidence of his discriminatory animus, not only has Chief Sullivan surrounded himself with non-Black executives and declared that doing so is for the long term success of the Department and necessary to strengthen our leadership team and structure, but he is also cutting ties with Black community.

70. To wit, the USCP has had a long-standing relationship with the Savoy Elementary School, located in Anacostia, which has a nearly all Black student body. For approximately 25 years prior to Chief Sullivan's tenure, USCP has held a Christmas party on Capitol Grounds or at USCP's headquarters for the underserved children who attend Savoy.

71. Chief Sullivan canceled the Christmas party in 2025, which was the first year in 25 years the USCP did not hold the party. Cancelling the party upset a large number of Black officers and executives at USCP, and it signaled to all officers that USCP , under Chief Sullivan, no longer cared about the Black community.

72. In addition to Chief Sullivan, Assistant Chief Gallagher (who is no longer employed at USCP) also showed bias against Black people generally. For example, while overseeing the Investigation's Division, Inspector Mendoza's Team requested additional resources to protect Representative Jasmine Crockett (Tex. 30), who is Black, stemming from an incident between

Crockett and a conservative activist with connections to Laura Loomer, in which the Representative stated that the so-called journalist was acting aggressively toward her and violating her personal space. The request was not unusual, and Mendoza's team planned to provide the escort. Mendoza was contacted on the night of March 25, 2025, by Asst. Chief Gallager and Deputy Chief Bowen who both acted as if they were irritated by the routine request. Gallagher's instruction was that he did not want Rep. Crockett to expect that USCP would provide an escort for the foreseeable future. Additionally, Gallagher instructed the Investigation Division to treat the journalist who caused the incident just like any other member of the public. Gallagher did not give the same pushback for white or male Members of Congress when it was requested around the same time period.

73. As an additional discriminatory slap in the face, the only blemish on Inspector Mendoza's disciplinary record is for cursing. And yet, as described above, Assistant Chief John Erickson (white male) has not been disciplined for his profane and insulting mug, which reads: "I'm the fucker in charge of you fucks," which he has now taken to at least one meeting with all-Black employees.

**COUNT I: DISCRIMINATION BASED ON RACE, SEX, AND/OR THE COMBINATION OF BOTH FOR THE DEPUTY CHIEF POSITION OVER THE OPERATIONAL SERVICES BUREAU**

74. Plaintiff repeats and incorporates each of the foregoing paragraphs as if they were specifically restated here.

75. Defendant USCP violated the Congressional Accountability Act because it rejected her for promotion to Deputy Chief over the Operational Service Bureau, because she is black.

76. In combination with the race discrimination claim, or in the alternative, Defendant USCP violated the Congressional Accountability Act because it rejected her for promotion to

Deputy Chief over the Operational Service Bureau, because she is a woman or because she is a black woman.

77. Plaintiff's claim of sex discrimination is stated in combination with, or in the alternative to, her claim of race discrimination, such that the claim should be read as a stand-alone claim or an intersectional discrimination claim (i.e., she was discriminated against because she is both black and female).

78. Plaintiff was eligible, motivated, and extremely well qualified for the Deputy Chief position.

79. The selectee for the position was a white man, Matthew Tighe.

80. Plaintiff was significantly better qualified than Tighe for the Deputy Chief Position over the Operational Services Bureau because she had supervised many of the specialty units under OSB and her otherwise more complex and significant assignments over her 24 years of service, her superior training, including her completion of the FBI National Academy, and her superior record of valorous service, including her direct and personal involvement fending off attackers on January 6, 2021.

81. Inspector Mendoza had outperformed Mr. Tighe at every prior selection, including for Sergeant, Lieutenant, Captain and Inspector. To wit, Mendoza was promoted before Tighe for the position of Sergeant, three years before Tighe for Lieutenant, nine months before Tighe for Captain, and she was listed ahead of Tighe on the Inspector promotion ranking.

82. Defendant manipulated the interview process to disadvantage Plaintiff and other minorities. Gallagher included one of his direct subordinates (Mr. Laparra), who had no law enforcement experience on the panel. Gallagher also included the Chief of Police for the U.S. Supreme Court on the interview panel because she and Gallagher are close friends. Gallagher did

not include any other neutral observer or sworn personnel with knowledge of the Deputy Chief position, which is a departure from USCP practice.

83. Chief Sullivan was motivated by discrimination, including racial discrimination when he failed to appoint Plaintiff to Deputy Chief – as evidenced by his actions described in the fact section above, including disbanding the Office of Equity and Inclusion as one of his first acts, hiring only white officers for the Deputy Chief and Assistant Chief positions, declaring that his all-white bevy of April 13, 2026 promotions were a first step in strengthening the USCP for the future, and canceling the Savoy Christmas party.

84. Chief Sullivan's discriminatory attitude against women is exhibited by his failure to take corrective action against training staff in the K9 unit who were found to have discriminated against a female candidate, in a verdict rendered by a jury in November 2025.

85. In the alternative, even if Chief Sullivan was not acting based on racial discrimination, his decision was tainted (under a Cat's Paw theory) by either Assistant Chief Gallagher's discriminatory animus against minorities, including women and black people, or by the discriminatory animus of the Capitol Police Board, which has the power to hire and fire the USCP police chief.

86. As a result of the USCP's unlawful conduct, Plaintiff has suffered substantial economic damages, in the form of lost income and future earning potential.

87. As a result of the USCP's unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, and humiliation.

## COUNT II: DISCRIMINATION BASED ON RACE AND/OR THE COMBINATION OF RACE AND SEX FOR THE ASSISTANT CHIEF POSITION OVER PROTECTIVE & INTELLIGENCE OPERATIONS

88. Plaintiff repeats and incorporates each of the foregoing paragraphs as if they were

specifically restated here.

89. Defendant USCP violated the Congressional Accountability Act because it failed to consider Plaintiff for the Assistant Chief position, because she is black. In the alternative, even if USCP was not acting on race discrimination, it was acting on a combination of race and sex discrimination, meaning that Plaintiff was passed over because she is a black woman (intersectional discrimination).

90. Plaintiff was eligible, motivated, and extremely well qualified for the Assistant Chief position.

91. On or about April 13, 2026, Chief Sullivan failed to announce the opportunity for promotion for three Assistant Chief positions, and he ignored USCP practice of holding competitive selections for the Assistant Chief position, in order eliminate Plaintiff from consideration for an Assistant Chief position.

92. All of Chief Sullivan's appointments to the three vacant Assistant Chief positions were white, and two were male.

93. The person selected to be the Assistant Chief over the Protective & Intelligence Operations was Jessica Baboulis/Ruskoski, who was a white female.

94. Chief Sullivan was motivated by discrimination, including racial and/or race and sex (intersectional) discrimination when he failed to appoint Plaintiff to Assistant Chief over the Protective and Intelligence Operations Bureau – as evidenced by discriminatory actions as recounted in the fact section above.

95. Plaintiff was significantly better qualified than Jessica Baboulis/Ruskoski for the Assistant Chief position due to her experience overseeing the Investigation Division (part of the Protective & Intelligence Bureau), and her more complex and significant assignments over her 24

years of service, her superior training, including her completion of the FBI National Academy, and her superior disciplinary record.

96. It is widely known that Jessica Baboulis/Ruskoski had inappropriate relations with a subordinate, for which – on information and belief – she was disciplined and had to be transferred to a different unit. Plaintiff has no serious disciplinary history in her 24-year career at USCP.

97. Defendant manipulated the interview process by (1) not announcing the promotion opportunity; (2) failing to hold a competitive selection process for the Assistant Chief position; (3) failing to inform Plaintiff that the Deputy Chief materials would be used in making appointments for the Assistant Chief positions; and (4) relying on the results of the interview in which the Chief of Police for the U.S. Supreme Court participated on the interview, given that she is widely known to be a close friend of Assistant Chief Gallagher.

98. The decision to appoint Baboulis/Ruskoski to be Assistant Chief was motivated by the same racial discrimination that resulted in her receiving more favorable treatment than black employees (alternatively, black female employees), including, in 2025 when Baboulis was permitted to work on her degree on official time and given training opportunities and funding for training that were not offered to black (or black female) officers, including Plaintiff.

99. Further in the alternative, even if Chief Sullivan was not acting based on sex and/or racial or intersectional discrimination, his decision was tainted (under a Cat's Paw theory) by either Assistant Chief Gallagher's discriminatory animus against minorities, including women and black people, or by the discriminatory animus of the Capitol Police Board, which has the power to hire and fire the USCP police chief.

100. As a result of the USCP's unlawful conduct, Plaintiff has suffered substantial economic damages, in the form of lost income and future earning potential.

101. As a result of the USCP's unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, and humiliation.

**COUNT III: DISCRIMINATION BASED ON RACE, SEX, AND/OR THE COMBINATION OF BOTH FOR THE ASSISTANT CHIEF POSITION OVER UNIFORMED OPERATIONS**

102. Plaintiff repeats and incorporates each of the foregoing paragraphs as if they were specifically restated here.

103. Defendant USCP violated the Congressional Accountability Act because it failed to consider Plaintiff for the Assistant Chief position, because she is black, a woman, and/or because she is a black woman.

104. Plaintiff's claim of sex discrimination is stated in combination with, or in the alternative to, her claim of race discrimination, such that the claim should be read as a stand-alone claim and as an intersectional discrimination claim (i.e., she was discriminated against because she is both black and female).

105. Plaintiff was eligible, motivated, and extremely well qualified for the Assistant Chief position.

106. On or about April 13, 2026, Chief Sullivan failed to announce the opportunity for promotion for three Assistant Chief positions, and he ignored USCP practice of holding competitive selections for the Assistant Chief position, in order eliminate Plaintiff from consideration for an Assistant Chief position.

107. All of Chief Sullivan's appointments to the three vacant Assistant Chief positions were white, and two were male.

108. Chief Sullivan was motivated by discrimination, including sex and/or race discrimination (including intersectional discrimination) when he failed to appoint Plaintiff to

Assistant Chief over Uniformed Operations - as evidenced by discriminatory actions as recounted in the fact section above.

109. Plaintiff was significantly better qualified than John Erickson for the Assistant Chief over Uniformed Operations due to her experience over all three of the bureaus housed under Uniformed Operations (Command and Coordination, Operational Services and Uniformed Services), and her more complex and significant assignments over her 24 years of service, her superior training, including her completion of the FBI National Academy, and her superior disciplinary record.

110. It is widely known that Erickson has a terrible disciplinary record, including for drunk driving on the job, and overtime pay fraud, in which he was involved in a scheme to inflate the number of hours he worked on overtime so that he could fraudulently reap the additional pay for time he did not work.

111. Plaintiff has no serious disciplinary history in her 24-year career at USCP.

112. Defendant manipulated the interview process by (1) not announcing the promotion opportunity; (2) failing to hold a competitive selection process for the Assistant Chief position; (3) failing to inform Plaintiff that the Deputy Chief materials would be used in making appointments for the Assistant Chief positions; and (4) relying on the results of the interview in which the Chief of Police for the U.S. Supreme Court participated on the interview, given that she is widely known to be a close friend of Assistant Chief Gallagher.

113. In the alternative, even if Chief Sullivan was not acting based on sex and/or racial discrimination, his decision was tainted (under a Cat's Paw theory) by either Assistant Chief Gallagher's discriminatory animus against minorities, including women and Black people, or by the discriminatory animus of the Capitol Police Board, which has the power to hire and fire the

USCP police chief.

114. As a result of the USCP's unlawful conduct, Plaintiff has suffered substantial economic damages, in the form of lost income and future earning potential.

115. As a result of the USCP's unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, and humiliation.

WHEREFORE, Plaintiff requests a jury trial and prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying her any monetary damages proved at trial in addition to compensatory damages in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com

Attorney for the Plaintiff